IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

```
FILED
DISTRICT OF NEBRASKA
AT_____M
APR 30 1987
William L. Olson, Clerk
By_____ Deputy
```

| | |
|---|---|
| JOHN RUST, et al., | CV85-L-433 |
| Plaintiffs, | |
| vs. | MEMORANDUM OF DECISION |
| GARY GRAMMER, et al., | |
| Defendants. | |

The inmate plaintiffs allege in this § 1983 action that conditions existing during a lockdown of the adjustment center at the Nebraska State Penitentiary in May 1985 violated their rights under the first, sixth, eighth, and fourteenth amendments. The defendant prison officials argue that the actions taken to regain control over what had become a crisis situation were necessary and reasonable under the circumstances. Gary Grammer, the warden of the penitentiary, ordered the lockdown. Harold Clarke, the associate warden for custody, was directly responsible for overseeing the implementation of the lockdown. Angelo Vinci is a correctional lieutenant who was assigned to the adjustment center during the lockdown.

A trial was held without a jury on February 9 and 10, 1987. The court appreciates the able representation of appointed counsel for the plaintiffs.

I. BACKGROUND

The plaintiffs, John Rust, Donald Hurley, Jeffrey Benzel and C. Michael Anderson, were housed in the adjustment center, a separate unit within the penitentiary, during May 22-30, 1985, the period of the lockdown. The adjustment center contains thirty-six maximum security cells that are divided in "A," "B," and "C" galleries. The plaintiffs were housed in "A" gallery; Rust and Hurley were confined in cell A11, Benzel was confined in cell A10, and Anderson was confined in cell A8. The "A" gallery cells, A1 through A16, all face out into the gallery hall. Behind the cells is a "tunnel" running the length of the gallery, which separates "A" and "B" galleries. See exhibit 1a.

Disruptions at the adjustment center had begun in late 1984 and escalated to a "near-riotous" level by May 22, 1985. Warden Grammer testified that officials had "lost control" of the unit, creating a "very hazardous" situation. Inmates were setting fires, verbally assaulting guards, making

excessive noise, throwing food, throwing human waste into food service carts and onto guards, and failing promptly to return from yard and shower periods. Grammer ordered the lockdown of the entire adjustment center, with the exception of cells A1-5, on May 22.

During the lockdown the inmates were fed no food other than two sandwiches three times a day. The sandwiches consisted only of two pieces of bread with either lunch meat, cheese, or peanut butter and jelly in between. The inmates were served no liquids, and drank, without cups, the tap water in their cells. They were denied shower privileges during the lockdown. Their exercise privileges were withheld until June 3, 1985.

The inmates' cells were shaken down on May 21 and 23, and nearly all property was removed from each cell, including cups, clothing, bedding, personal hygiene items, papers, books, writing utensils, legal materials, religious materials, and medications. They were left with a sheet and blanket, a mattress, and a prison-issue jumpsuit. Benzel testified, however, that he had only boxer shorts and a sheet and found it difficult to stay warm. Prison officials inventoried the property, returned some immediately, and held all combustible and potentially dangerous materials for the duration of the lockdown or longer. Legal materials concerning current litigation were returned to inmates shortly after the shakedown. On or about May 24 and 25 the inmates were given one towel, toothbrush, and toothpaste, but no other hygiene materials.

Visitation was not permitted during the lockdown. When visitation resumed on May 29, it was subject to Operational Memorandum 205.1.102, which, among other things, required those in disciplinary segregation to wear restraints during visits. *See* exhibits 5 (effective May 20, 1985) and 6 (effective September 5, 1985). The OM also limits visits to certain days; death row inmates, for example, may have visits only on Wednesday and Thursday mornings.

Telephone calls were suspended during the lockdown, although calls to attorneys were to be allowed if an inmate had a court action pending within two weeks. Inmates were allowed to receive letters during the lockdown, but could have only one in a cell at a time. Prison officials testified that writing materials and envelopes were available on request.

The plaintiffs testified that no laundry service was provided during the lockdown, but prison officials said that clean linens and clothing would be issued on request. None of the plaintiffs testified that he requested laundry service.

There is no evidence that any of the plaintiffs abused any of the privileges that were restricted during the lockdown. There is no evidence that any of the plaintiffs were responsible for the disruptions in the adjustment center. The plaintiffs argue that prison officials were not justified in taking away their rights under the facts of this case merely because they were housed near misbehaving inmates. They contend that prison officials could identify which inmates were delinquent in returning from yard and shower privileges, which is true. The officials could not, however, always be sure which inmates were throwing items and creating noise. Although the evidence does not suggest that the plaintiffs were plausible sources of the fire on A gallery (many fires apparently occurred on B and C galleries), there is ample evidence that the situation as a whole in the adjustment center was out of control, dangerous, and likely to continue or deteriorate.

## II. STATE-CREATED LIBERTY INTEREST

The Supreme Court has "repeatedly held that state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." Vitek v. Jones, 445 U.S. 480, 488 (1980). Nevertheless, it has "never held that statutes and regulations governing daily operation of a prison system conferred any liberty interest in and of themselves." Hewitt v. Helms, 459 U.S. 460, 469 (1983).

To create a constitutionally-protected liberty interest the state statute must contain "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed," and that language must be used "in connection with requiring specific substantive predicates ...." Id. at 471, 472. Such language used in administrative regulations and "official policy pronouncements" also can create constitutionally-protected liberty interests. See Dace v. Mickelson, 797 F.2d 574, 576 (8th Cir. 1986); Parker v. Corrothers, 750 F.2d 653, 659-61 (8th Cir. 1984).

The plaintiffs argue that Neb. Rev. Stat. § 83-4,114 (Reissue 1981) and Neb. Dept. of Corr. Serv. Rule 6(10)(b) create a liberty interest in the plaintiffs to be free from the deprivations that occurred during the lockdown. Section 83-4,114 provides:

> There shall be no corporal punishment or disciplinary restrictions on diet. Disciplinary restrictions on clothing, bedding, mail, visitations, use of toilets, washbowls, or scheduled showers shall be imposed only for abuse of such privilege or facility. No person in the adult division shall be placed in solitary confinement

>for disciplinary reasons for more than fifteen
>consecutive days, or more than thirty days out
>of any forty-five day period, except in cases of
>violence or attempted violence committed
>against another person or property when an
>additional period of isolation for disciplinary
>reasons is approved by the warden. This provision
>shall not apply to segregation or isolation of
>persons for purposes of institutional control.

Rule 6(10)(b) provides, in relevant part, that "[r]estrictions on clothing, bedding, mail, visitations, use of toilets, wash bowls, or scheduled showers shall be imposed only for abuse of such privileges or facilities." See exhibit 3.

The plaintiffs argue for a broad reading of "disciplinary" that encompasses the types of restrictions imposed on them during the lockdown. The defendants argue against the expansive definition of "disciplinary" urged by the plaintiffs and contend that their actions were an attempt to control a disruptive situation, not an imposition of discipline.

Citing Rule 5, which is the Code of Offenses governing inmate behavior, the plaintiffs contend that it is illogical "for defendants to argue that their actions were taken in response to conditions and events requiring disciplinary action, yet deny that their actions were 'disciplinary' in nature." Plaintiffs' brief at 16. That the widespread misbehaviors that necessitated the lockdown are prohibited by the provisions of Rule 5 does not logically require the conclusion that prison officials' response was "disciplinary" as the word is used in § 83-4,114 and Rule 6(10)(b).

All discussion of discipline in the rules concerns infractions by specifically-identified inmates who are charged with an offense and face possible punishment after notice and a hearing. Similarly, § 83-4,114 is set within Article 4(k) of Chapter 83 of the Nebraska Revised Statutes, which addresses "Disciplinary Procedures in Adult Institutions," and involves infractions of rules that result in the filing of a disciplinary report concerning an individual inmate's misbehavior and the holding of a disciplinary hearing.

Both Rule 6(10)(b) and § 83-4,114, therefore, appear to use "disciplinary" to mean the process of administering a penalty to an inmate after a determination that the particular inmate committed the offense(s) charged. The apparent purpose of the "disciplinary" process is to punish inmates for past violations. Neither the statute nor the rule governs the imposition of coercive limitations for the purpose of ending

5

ongoing violations of prison rules. Cf. Ort v. White, 813 F.2d 318 (11th Cir. 1987)(WESTLAW, CTA database); Jones v. Mabry, 723 F.2d 590 (8th Cir. 1983)(distinguishing "punishment" from "the imposition of disabilities for administrative or regulatory purposes" in due process analysis), cert. denied, 467 U.S. 1228 (1984).

This conclusion is supported by the language of the second half of § 83-4,114:

> No person in the adult division shall be placed in solitary confinement for disciplinary reasons for more than fifteen consecutive days, or more than thirty days out of any forty-five day period, except in cases of violence or attempted violence committed against another person or property when an additional period of isolation for disciplinary reasons is approved by the warden. This provision shall not apply to segregation or isolation of persons for purposes of institutional control.

The statute itself distinguishes confinement "for disciplinary reasons" from confinement used "for purposes of institutional control." The confinement restriction of § 83-4,114 is not applicable in the latter instance.

The plaintiffs nevertheless argue that the exclusion of inmates in cells A1 through A5 "refutes defendants' contention that the restrictions were not 'disciplinary' in nature but were merely designed as a security measure to eliminate movement within the Adjustment Center. If that had been the purpose of the restrictions, there would have been no reason to exempt the first five prisoners on 'A' Gallery from the lockdown." Plaintiffs' brief at 8. The defendants were sure that the inmates in cells A1 through A5 were not involved in the unrest, were unsure which of the other inmates on A gallery were involved, and needed to stop the unrest occurring on the remainder of A gallery. That the defendants focused their control measures on the general areas of the adjustment center where ongoing problems had occurred does not make their actions "disciplinary" within the meaning of the statute and rule.

The plaintiffs contend that the broad interpretation given "discipline" in Kelly v. Brewer, 239 N.W.2d 109 (Iowa 1976) is appropriate in the present case. The analysis and holding of the Iowa Supreme Court were specific to the statutory language, legislative history, and facts of that case and are not applicable in this case.

This court is without guidance from the Nebraska Legislature and the Nebraska Supreme Court in defining "disciplinary" as it is used in the statute and the rule.

Nonetheless, it seems abundantly clear that the word does not include actions affecting a group of inmates that are taken by prison officials in an emergency to regain control and maintain the security of the institution.

The actions taken by prison officials in this case were not "disciplinary"; they were for the purpose of forcing immediate compliance with prison rules in order to maintain institutional safety and security. Section 83-4,114 and Rule 6(10)(b) do not, therefore, govern the present case and there is no need to consider whether they create a constitutionally-protected liberty interest.

### III. LIBERTY INTERESTS ARISING DIRECTLY UNDER THE FOURTEENTH AMENDMENT

"Liberty interests protected by the Fourteenth Amendment may arise from two sources -- the Due Process Clause itself and the laws of the States." Hewitt, 459 U.S. at 466. The pretrial order, in part, poses the issue whether the actions of the defendants "deprive[d] plaintiffs of liberty interests, including, but not limited to any such liberty interest created by [state law], without due process of law in violation of the Fourteenth Amendment to the United States Constitution ...."

It does not appear that the plaintiffs have presented distinct procedural or substantive due process claims in this case beyond their argument that state law created an applicable liberty interest. The only discussion of procedural due process appears in the defendants' brief (pages 13-15), and lockdown cases that have considered procedural due process arguments have concluded that no liberty interests requiring procedural protection were implicated by lockdown conditions. See Caldwell v. Miller, 790 F.2d 589 (7th Cir. 1986); Hayward v. Procunier, 629 F.2d 599 (9th Cir. 1980), cert. denied, 451 U.S. 937 (1981); LaBatt v. Twomey, 513 F.2d 641 (7th Cir. 1975). Cf. Jones, 723 F.2d 590 (reclassifying inmates involved in crisis-creating misbehavior not "punishment" triggering due process protection). None of these cases applied a substantive due process analysis. Neither do the plaintiffs appear to urge such analysis, although they do state that

> [t]he defendants' imposition of restrictions affecting the terms and conditions of plaintiffs' confinement in the Adjustment Center during and subsequent to the lockdown were arbitrary and capricious in that plaintiffs did not cause or participate in the disturbances which precipitated the lockdown ....

Plaintiffs' brief at 8. That statement appears as part of the statement of facts, and no substantive due process

5

arguments appear in the arguments. Moreover, I am inclined to think that, in the present case, the cruel and unusual punishment clause provides the plaintiffs no less protection than would the due process clause.

The Supreme Court recently has said of substantive due process claims by inmates injured by prison officials who were responding to prison unrest and the taking of hostages:

> [T]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners ... where the deliberate use of force is challenged as excessive and unjustified.
>
> * * *
>
> We only recently reserved the general question "whether something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause. Daniels v. Williams, ___ U.S. ___, ___ n.3 (1986) .... Because this case involves prison inmates rather than pretrial detainees or persons enjoying unrestricted liberty we imply nothing as to the proper answer to that question outside the prison security context by holding, as we do, that in these circumstances the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishments Clause.

Whitely v. Albers, 54 U.S.L.W. 4236, 4240 (U.S. Mar. 4, 1986). Cf. Hudson v. Palmer, 468 U.S. 517, 530 (1984)(inmates have no fourth amendment protection against searches of prison cells; remedy for "calculated harassment unrelated to prison needs" is an eighth amendment claim).

It is clear that prisoners' excessive force claims should be analyzed only under the eighth amendment standards for cruel and unusual punishment. While the Whitley holding does not require the conclusion that an eighth amendment claim is the only appropriate challenge in a case like the present case, the eighth amendment, as discussed below, requires an analysis that takes into account factors that would be considered under a substantive due process analysis. Because of this, and because the plaintiffs appear not to pursue a substantive due process theory, the eighth amendment provides the appropriate framework for analyzing most of the conditions challenged in this case.

### IV. EIGHTH AMENDMENT CRUEL AND UNUSUAL PUNISHMENT

5

> "'[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves.'" Bell v. Wolfish, 441 U.S. 520, 546-47 (1979)(quoting Pell v. Procunier, 417 U.S. 817, 823 (1974)). "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel ...." 441 U.S. at 547. "[E]ven when an institutional restriction infringes a specific constitutional guarantee ... the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." Id.
>
>> When the "ever-present potential for violent confrontation and conflagration," Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 132 (1977), ripens into actual unrest and conflict, the admonition that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators," Rhodes v. Chapman, 452 U.S., at 349 n.14, carries special weight.
>
> Whitley v. Albers, 54 U.S.L.W. 4236, 4239 (U.S. Mar. 4, 1986).
>
> In Rhodes v. Chapman, 452 U.S. 337, 344-45 (1981), the Court announced "the limitation that the Eighth Amendment ... imposes upon the conditions in which a State may confine those convicted of crimes." Although Rhodes involved normal prison conditions, not those temporarily imposed in response to a crisis, it provides a starting point for eighth amendment analysis.
>
>> Today the Eighth Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain ... or are grossly disproportionate to the severity of the crime .... Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification."
>>
>> ***
>>
>> These principles apply when the conditions of confinement compose the punishment at issue. Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting punishment.
>
> Id. at 346, 347.
>
> The Court in Whitley further explained the eighth amendment

5

standard and applied it in analyzing prison officials' response to a crisis within the institution.

> To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. ... It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock. The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense.
>
> \*\*\*
>
> [I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used. ... In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance.
>
> ... [W]e think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." ... "[S]uch factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted," ... are relevant to that ultimate determination. From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness

> that it occur. ... But equally relevant are such
> factors as the extent of the threat to the safety
> of staff and inmates, as reasonably perceived
> by the responsible officials on the basis of the
> facts known to them, and any efforts made to
> temper the severity of a forceful response.

Id. at 4238, 4239.

### V. CHALLENGED CONDITIONS

The cases cited by the plaintiffs to support their arguments challenging the constitutionality of the various restrictions imposed during the lockdown do not arise out of prison unrest fact patterns. Therefore, before examining each of the challenged restrictions, I note that any harm suffered by the inmates in the present case must be viewed in the context of unrest at the prison that threatened significant safety and security interests.

#### A. FOOD

The plaintiffs testified that the dry sandwich and water diet imposed during the nine days of the lockdown caused weight loss, stomach cramps, constipation, headaches, and chills. The prison dietician was not consulted about the restricted diet. She testified that the sandwich diet was nutritionally inadequate.

The defendants imposed the sandwich diet in part to stop the contamination of food service carts, the throwing of food, and the use of containers for throwing human waste and other material. The decision to suspend hot meal service cannot be faulted, but the defendants' failure to provide a nutritionally adequate substitute under the facts of this case approaches cruel and unusual punishment. The defendants failed to consult with the prison dietician about developing a nutritious substitute. There was no evidence that the defendants attempted to temper the nutritional deprivation during the lockdown.

"[T]he constitution requires that the jail diet be adequate to maintain the health of the inmates." Campbell v. Cauthron, 623 F.2d 503, 508 (8th Cir. 1980). The diet challenged in Campbell included coffee and two sweet rolls for breakfast and TV dinners for lunch and supper. An average-sized person would lose nine pounds per month on that diet, which was deficient in calcium and vitamin C. Id. at 508. The Eighth Circuit concluded that the diet violated the inmates' right to be free from cruel and unusual punishment. Id. at 508-09. The court agreed that a similar diet was unconstitutional in Ahrens v. Thomas, 570 F.2d 286 (8th Cir. 1978), aff'g in part and modifying in part, 434 F. Supp. 873 (W.D.Mo. 1977). The district court had found that inmates

"receiving the diet ... over an extended period of time would suffer from malnutrition, poor health, and disease," 434 F. Supp. at 873, and required that "[a]ll meals served in the jail shall meet appropriate minimum nutritional standards." Id. at 903.

The defendants argue that the majority of cases concerning eighth amendment challenges to prison diets either "involve the withholding of all food over a prolonged period of time ...or the serving of inadequate meals over a prolonged period of time ...." Defendants' brief at 4-5. It also is true that the cases generally involve normal prison conditions, not lockdown states. The plaintiffs in the present case were feed three times daily each day of the lockdown. The meals served were inadequate, but the deprivation did not continue for a highly unreasonable length of time. Many of the problems leading up to the lockdown involved the contamination of food, or the inappropriate use of food. Thus, although lack of nutritional adequacy was not necessary to achieve the objectives prompting the lockdown, it did not rise to the level of cruel and unusual punishment in this case.

### B.  EXERCISE

"If limitations on exercise periods are severe, they may raise a question about their adequacy to ensure proper health. ... The limitation on exercise can be evaluated in light of the ... nature of the inmate's confinement." Wright v. Minnesota Department of Corrections Stillwater, No. 86-5308, slip op. at 6-7 (8th Cir. Feb. 17, 1987). In Leonard v. Norris, 797 F.2d 683 (8th Cir. 1986), the Eighth Circuit held that denial of out-of-cell exercise for the first fifteen days that inmates were in punitive isolation, while "perhaps even harsh," was "not cruel or barbaric." Id. at 685. The court observed that "[p]rison authorities must have some tools available as sanctions" to deter "disruptive behavior." Id., distinguishing Campbell v. Cauthron, 623 F.2d 503, 507 (8th Cir. 1980).

According due deference to the prison officials' decision, I conclude that fourteen days without exercise in light of the need for the defendants to regain control of the adjustment center is not cruel and unusual punishment. See Caldwell v. Miller, 790 F.2d 589 (7th Cir. 1986) (constitutional during lockdown to forbid out-of-cell exercise for one month); Hayward v. Procunier, 629 F.2d 599 (9th Cir. 1980)(same), cert. denied, 451 U.S. 937 (1981). The exercise restriction imposed in the present case, however, teetered on the edge of being cruel and unusual. The officials knew who had and who had not abused yard privileges. Modified privileges, at least for those who had not abused their exercise period prior to the lockdown, could have been provided to inmates, one at a time, on occasion

during the lockdown. I will accept the defendants' explanation that the restriction contributed to the over-all effectiveness of the lockdown, but caution them concerning the use of exercise restrictions in the future.

### C. SHOWERS AND PERSONAL HYGIENE

"Limitations placed on shower rights do not raise the same concerns as do limitations placed on exercise. Sweet [v. South Carolina Department of Corrections, 529 F.2d 854, 860 (4th Cir. 1975)]...." Wright, No. 86-5308, slip op. at 7. The cases cited by the plaintiffs, none of which involves a lockdown situation, do not persuade me that the shower restrictions imposed in the present case rise to the level of a constitutional violation. See, e.g., Preston v. Thompson, 589 F.2d 300 (7th Cir. 1978)(affirmed district court's requirement that inmates get two showers per week upon finding that three-month period without showers was not justified by prison conditions); McCray v. Burrell, 516 F.2d 357 (4th Cir. 1975)(confinement in barren cell with no clothing or hygiene items, no water, and a filthy hole in the floor for a toilet was a per se eighth amendment violation); Pinkston v. Bensinger, 359 F. Supp. 95 (N.D.Ill. 1973)(no constitutional violation in rule allowing segregated inmates one shower per week, which can be withdrawn if inmate abuses privilege); Lake v. Lee, 329 F. Supp. 196 (S.D.Ala. 1971) (inmates in segregated confinement to get two baths per week; those in punitive isolation get one per week).

The plaintiffs in the present case had hot and cold running water and towels in their cells throughout the lockdown. Their cells were sanitary, and their toothbrush and toothpaste were returned within about a day after the shakedown. The restrictions on showers and hygiene supplies were for a limited time presented no threat to the inmates' health, and were directly related to significant safety and security interests.

### D. CLOTHING, BEDDING, AND LAUNDRY

In Maxwell v. Mason, 668 F.2d 361, 365 (8th Cir. 1981), the Eighth Circuit said:

> [I]t is clearly the law in this Circuit that clothing is a "basic necessity of human existence" which cannot be deprived in the same manner as a privilege an inmate may enjoy. ... [T]he reason for that resides not solely in the requisites of proper hygiene, but in that "the Eighth Amendment's basic concept is nothing less that the dignity of man."

The Maxwell holding was limited, both by the district court and by the Eighth Circuit, to the facts of the case. Id. at 363. The conditions of confinement were different, and the

5

case involved the use of restrictions as punishment, not as a means of regaining institutional control. The court said "we need intimate no judgment as to whether deprivation of clothing or bedding as a punitive measure, standing alone, would be cruel and unusual." Id. at 363 n.8. Nothing in Maxwell suggests that the conditions in the present case amount to an eighth amendment violation.

The present case, contrary to the plaintiffs' contention, is unlike Ramos v. Lamm, 639 F.2d 559 (10th Cir. 1980)(filthy housing units, vermin infestation, "heavily stained and soiled" bedding "not cleaned or changed when a new inmate is assigned to a cell"), cert. denied, 450 U.S. 1041 (1981). It is similar to Lyon v. Farrier, 730 F.2d 525 (8th Cir. 1984) (strict restrictions on clothing and amount of possessions in cell after prison riot upheld for health and security reasons). The clothing and bedding restrictions were directly related to the defendants' objective of reducing the amount of potentially flammable materials in the inmates' cells. There is no evidence that the plaintiffs would not have received clean bedding or clothing if they had requested it. There also is no evidence that Benzel requested and was denied warmer clothing. Although the restrictions were inconvenient, they met important penological objectives and did not violate the eighth amendment.

### E.  MAIL, TELEPHONES, LEGAL DOCUMENTS

The limitations on mail and telephone use "further[ed] an important governmental interest," and "the limitation of First Amendment freedoms" was "no greater than .. necessary or essential to the protection of the ... governmental interest" in this case. Procunier v. Martinez, 416 U.S. 396, 413 (1974). The plaintiffs were permitted to send and receive mail during the lockdown. The inconvenience of swapping letter for letter and of requesting writing supplies is not of constitutional magnitude and directly furthered the defendants' attempt to prevent the setting of fires. See Little v. Norris, 787 F.2d 1241 (8th Cir. 1986). The restriction on telephone calls lasted only nine days, was tempered by the continued availability of the mail, and was related to the defendants' effort to restore security and order. The plaintiffs' free speech rights were not violated during the lockdown.

The defendants did not suspend telephone use for purposes of contacting counsel. They continued to permit inmates to call their attorneys if they had a court hearing within two weeks of the requested call. Benzel's request to call his attorney was denied because he had no upcoming hearing. He was not prohibited from sending letters to his attorney.

> Inmates are constitutionally guaranteed access to the courts. Bounds v. Smith, 430 U.S. 817,

5

> 828 ... (1977). A prison regulation or practice
> that burdens an inmate's right of access "must
> be weighed against the legitimate interests
> of penal administration and the proper regard
> that judges should give to expertise and
> discretionary authority of correctional
> officials." Procunier v. Martinez, 416 U.S.
> 396 ... (1974). The fundamental concern is
> whether an inmate is denied meaningful access
> to the court. Bounds, 430 U.S. at 823 ....

Williams v. Wyrick, 747 F.2d 1231, 1232 (8th Cir. 1984). There is no evidence that any of the plaintiffs was denied meaningful access.

This same conclusion applies to the plaintiffs' contention that their legal documents were confiscated in violation of their sixth amendment rights. Most legal documents were returned within two days of the shakedown. There is no evidence that any immediately important materials were withheld. The plaintiffs' sixth amendment rights were not violated during the lockdown.

### F.  RELIGIOUS MATERIALS

"A prison regulation concerning the exercise of religion that is more restrictive than necessary to meet the penal system's objectives is impermissible under the free exercise of religion clause of the First Amendment." Native American Council of Tribes v. Solem, 691 F.2d 382, 385 (8th Cir. 1982). Federal courts must, however, defer to prison official's evidence of institutional security concerns, unless inmates prove the restrictions to be "exaggerated" responses. Otey v. Best, 680 F.2d 1231, 1233 (8th Cir. 1982).

Anderson challenges the defendants' failure to return his religious materials after the lockdown. He sent a request, dated June 17, 1985, to Clarke for the materials. Exhibit 34. Clarke responded that he needed "to be told what constitutes your 'spiritual material' before a decision can be made to have them provided to you." Id. Anderson did not provide the requested information. There is no evidence that Clarke or any other defendant violated Anderson's free exercise rights.

### G.  MEDICATIONS

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97 (1976).

Benzel testified that he was without his athlete's

5

foot ointment for three weeks and that the condition worsened. Hurley similarly was without his athlete's foot treatment as well as some unspecified medication for an ear infection; both conditions, he said, worsened during the lockdown. The medications removed from the plaintiffs' cells were not prescription drugs. Inmates are not permitted to keep prescription drugs in their cells. There was unrefuted testimony that prison officials continued to dispense prescribed drugs during the lockdown.

The evidence establishes neither "deliberate indifference" nor "serious medical needs," and no cases have been cited that suggest otherwise.

### H. VISITATION

#### 1. During lockdown

The defendants suspended visitation during the lockdown, although Anderson was permitted a visit on May 27. To be an eighth amendment violation, "the isolation caused by a visitation policy must, together with other circumstances of incarceration, actually threaten the mental and emotional stability of the inmates." Laaman v. Helgemoe, 437 F. Supp. 269, 321 (D.N.H. 1977). The restriction during the lockdown was brief, directly related to important penological objectives, and tempered by the continued availability of mail. There was no eighth amendment violation.

Neither did the restriction violate the first amendment. Prison officials have "broad discretionary authority over visitation rights." Wright, No. 86-5308, slip op. at 6. "In the absence of substantial evidence that prison administrators denied visitation rights in an exaggerated response to a prison atmosphere, the courts are to defer to the administrators' expertise and judgment." Id. There was no evidence that the visitation restriction was an "exaggerated response." The cases cited by the plaintiffs do not suggest otherwise. "No constitutional right of a prisoner is violated when he is not allowed to see visitors during an emergency lockdown, even if the requested visitor is a religious advisor." Rogers v. Scurr, 676 F.2d 1211, 1216 (8th Cir. 1982).

#### 2. After lockdown

The plaintiffs challenge the limits on the days of the week during which visits for different classifications of inmates may occur. They argue that OM 205.1.102 "effectively prohibit[s] plaintiffs from receiving visitors on weekends, the only time when friends and family members who hold full-time jobs are able to visit. Such restrictions have been held to be unnecessary to any legitimate institutional security interest and therefore violative of prisoners'

First, Eighth, and Fourteenth Amendment rights." Plaintiffs' brief at 38. Only the death row plaintiffs are restricted to weekday-only visits. See exhibit 6.

None of the cases cited by the plaintiffs supports the proposition that the restriction on death row visits to Wednesday and Thursday mornings only violates the constitution. All but one of the cited cases either involve pretrial detainees or are factually dissimilar. In Hardwick v. Ault, 447 F. Supp. 116 (M.D.Ga. 1978), inmates housed in a disciplinary unit challenged many conditions of their confinement, including the visitation rules. Among the restrictions on visitation was the requirement that all visits occur on weekdays. Although the court was highly critical of the serious limitation weekday-only visits put on the inmates, it held only that "the state must, as a part of its general plan to alter H-House, submit rules which will allow 'reasonable visitation,' 'adapted to individual circumstances.'" Id. at 131.

The only evidence of possible harm from this policy was the testimony of Lois Thompson, a retired court reporter from Omaha, who has a "business relationship" with Rust because he is permitting her to write a book about him. She has "asked for special visitation and been refused." Rust did not testify that other visitors are unable to see him during the week, and Thompson's testimony suggested that her visits have become very infrequent for reasons in addition to the visitation policy. The facts of this case do not present a first or eighth amendment violation.

The plaintiffs also launch a due process challenge against the visitation policy imposed by OM 205.1.102, which raises an important issue concerning the jurisdiction of this court, as discussed in the next section.

### VI. NEBRASKA ADMINISTRATIVE PROCEDURE ACT

Rules and Regulations of the Nebraska Department of Correctional Services must be issued pursuant to the Nebraska Administrative Procedure Act (APA). Neb. Rev. Stat. § 83-4,112(1) (Reissue 1981 & Cum. Supp. 1986). The APA requires a public hearing, approval by the governor, and filing with the revisor of regulations prior to a regulation becoming effective. Id. §§ 84-907, -908. Operational Memorandum 205.1.102 was not promulgated according to the requirements of the APA. The plaintiffs argue that OM 205.1.102 has "the effect of amending and restricting prior rules and regulations regarding visiting privileges," Plaintiffs' brief at 39, and should have been issued according to the procedures in the APA. They allege that the failure of state officials to follow the Nebraska APA violated their federal due process rights. The defendants respond that the OM merely involves internal prison administration, and that this

court lacks jurisdiction to consider the plaintiffs' APA claim.

It appears that the eleventh amendment prohibits this court from deciding this claim because the claim presents no federal constitutional question and asks me to order state officials to follow state law. In reviewing a similar claim involving Iowa prison rules and the Iowa APA, the Eighth Circuit said:

> A federal court has authority to consider State law and administrative regulations to determine whether they provide a liberty or property interest affording due process protection. A federal court does not have jurisdiction, however, to award relief against a State based only on State law where violation of State law does not amount to a constitutional violation. Pennhurst State School and Hospital v. Halderman, 465 U.S. 89 ... (1984). The Iowa Administrative Procedure Act is a comprehensive procedural plan established by State law. Violation of the Act is a violation of State law and not of due process. Jurisdiction to construe the State statute is in the State Courts of Iowa.
>
> Accordingly, we vacate the Magistrate's holding, issued prior to Pennhurst, that there was no violation of the Iowa Administrative Procedure Act. This is a question for determination by the State Courts of Iowa.

Harmon v. Auger, 768 F.2d 270, 275 (8th Cir. 1985).

Thus, the Eighth Circuit has held that there is no federal question involved in a claim that a rule was not promulgated pursuant to a state APA. It appears also to have held, on the authority of Pennhurst, that a federal court cannot take pendent jurisdiction of a state law claim that officials failed to comply with a state APA.

In Pennhurst, the Supreme Court held that the eleventh amendment denies federal courts jurisdiction over claims that state officials violated state law. See 465 U.S. at 98-106. The Court then held that "[t]his constitutional bar applies to pendent claims as well." Id. at 120. As explained by the First Circuit, the Supreme Court in Pennhurst "stated that the doctrine [of pendent jurisdiction] had a different scope when applied to suits against a state." Parks v. United States, 784 F.2d 20, 24 (1st Cir. 1986).

Although federal courts have jurisdiction to order prospective relief against state officials who violate federal constitutional rights in order "to vindicate federal

5

rights and hold state officials responsible to 'the supreme authority of the United States,'" Pennhurst, 465 U.S. at 105,

> [a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

Id. at 106. Even if the OM should have been promulgated pursuant to the Nebraska APA, the plaintiffs suffered no federal constitutional injury. A determination whether state law was violated and, if so, whether these plaintiffs are entitled to relief must be made by a state court.

The plaintiffs have failed to prove that the conditions imposed during the lockdown violated any of their constitutional rights, so I shall direct that judgment be entered for the defendants.

Dated this 30th day of April, 1987.

BY THE COURT

*[signature]*

United States District Judge